**F I L E D**

PUBLISH

**JUL 2 2002**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRYAN K. NANCE,

        Plaintiff-Appellant,

v.

SUN LIFE ASSURANCE COMPANY
OF CANADA,

        Defendant-Appellee.

No. 01-6234

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-00-724-T)**

Submitted on the briefs:

Glen Mullins, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Arlen E. Fielden of Crowe & Dunlevy, Oklahoma City, Oklahoma, and
Mark E. Schmidtke of Hoeppner Wagner & Evans LLP, Valparaiso, Indiana,
for Defendant-Appellee.

Before **SEYMOUR**, **McKAY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Plaintiff Bryan K. Nance appeals the district court's entry of summary judgment in favor of Sun Life Assurance Company of Canada (Sun Life) on his claim for long-term disability benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq*. The district court ruled that Sun Life's decision to deny benefits based on Plaintiff's back condition and depression was not arbitrary or capricious. We have jurisdiction under 28 U.S.C. § 1291, and we affirm. [1]

## I. Background

Louis Dreyfus Natural Gas (Dreyfus) hired Plaintiff to work as an accountant in 1993. In July 1997 Plaintiff was injured in a car accident. Because of his injuries, Plaintiff left work on September 17. He never returned.

As an employee of Dreyfus, Plaintiff was a participant in the company's employee disability benefit plan (the Plan), which was funded and administered by Sun Life. He received short-term benefits under the Plan from September of 1997 through March 4, 1998. According to Sun Life, Dreyfus terminated Plaintiff's employment on March 4. Plaintiff contends that his termination date was March 13, but our decision does not require choosing between the two dates.

---

[1] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).

In January 1998 Plaintiff made a claim for long-term disability benefits based on a diagnosis of, and surgery for, "left thoracic outlet syndrome" (LTOS), a compression of the nerves and blood vessels between the collarbone and first rib, causing, among other things, pain in the arms. *See* The Sloane-Dorland Annotated Medical-Legal Dictionary 511 (1992). After initially denying those benefits, Sun Life reconsidered and ultimately approved them on April 27, 1999. During the interim between initial denial and approval of benefits, however, one of Plaintiff's doctors wrote a letter releasing him "to return to his regular activities without restrictions." Based on this letter Sun Life limited Plaintiff's benefits to the period ending one day prior to the date of the doctor's release, or July 21, 1998.

On June 4, 1998, while Sun Life was considering Plaintiff's claim based on LTOS, it received a letter from his surgeon noting that he had become "exceedingly depressed." Then, two weeks after Plaintiff was granted limited long-term benefits, his attorney notified Sun Life of a possible claim for benefits based on a back condition allegedly caused by the same car accident that caused his LTOS. After reviewing additional evidence, Sun Life denied the back claim on June 8, 1999, because (1) it was based on a congenital condition unrelated to his LTOS and (2) the medical records reflected that he did not suffer back pain until after his termination from employment. Two months later Sun Life denied

Plaintiff's depression claim, finding again that the evidence did not support the existence of a disabling condition prior to his termination. In February and March 2000 Plaintiff forwarded additional material concerning his back pain and depression, but Sun Life refused to reopen his claim because all levels of appeal had been exhausted.

On April 12, 2000, Plaintiff filed suit against Sun Life, alleging it violated 29 U.S.C. § 1132 in denying his claim for benefits. The district court granted Sun Life's motion for summary judgment, concluding that Sun Life's decisions to deny Plaintiff long-term disability benefits were not arbitrary or capricious. Plaintiff has appealed, arguing that (1) the district court erred by using the wrong standard of review; (2) the district court erred by limiting its review to the evidence Sun Life had acquired as of August 9, 1999 (the date of the last denial); and (3) Sun Life's denial of benefits was based on an unreasonable interpretation of the Plan and was not supported by substantial evidence.

## II. Standard of Review

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "We review the grant of summary judgment *de novo*, applying the same standard as [should have been applied by] the district court" in reviewing the decision by Sun Life to deny benefits. *Amro v. Boeing Co.*, 232

F.3d 790, 796 (10th Cir. 2000). What that standard should be is disputed by the parties on appeal, as it was in district court. Plaintiff urges that we review Sun Life's denial of benefits *de novo*, whereas Sun Life argues that we must uphold its decision unless we find it to be arbitrary or capricious.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court wrote that a denial of benefits challenged under § 1132 "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the plan grants discretionary authority to the administrator or fiduciary, the exercise of that authority will be set aside only if it is arbitrary or capricious. *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996).

In applying *Firestone*, it is essential to focus precisely on what decision is at issue, because a plan may grant the administrator discretion to make some decisions but not others. Plaintiff challenges two decisions by Sun Life in denying him benefits. First, he contends that Sun Life misconstrued the Plan when it decided that he was covered for a disability only if the disability began before his employment with Dreyfus was terminated. Second, he contends that Sun Life erred in its factual decision that he was not disabled at the time of termination. Depending on the specific language of the Plan, the standard for our review of Sun

Life's interpretation of the Plan and the standard for our review of Sun Life's fact finding may or may not be the same.

Unfortunately, the arguments in the parties' briefs concerning the standard of review do not distinguish between the two challenged aspects of Sun Life's denial of benefits. In any event, we need address only the standard of review for Sun Life's fact finding. The standard of review does not affect our decision regarding Sun Life's interpretation of the Plan with respect to coverage of disabilities. Assuming, without deciding, that we should apply *de novo* review, we confirm Sun Life's interpretation later in this opinion. Because Sun Life's interpretation survives the more stringent *de novo* review, the interpretation could not be arbitrary or capricious.

We now consider whether the Plan confers discretion on Sun Life in finding the facts relating to disability. Some Plan provisions do not use language suggesting discretion. The Plan states that "[i]f Sun Life receives Notice and Proof of Claim that an Employee is Totally or Partially Disabled, a Net Monthly Benefit will be payable, subject to the Limitations and Exclusions." To receive that benefit, "Proof of Total or Partial Disability must be given to Sun Life upon request and at the Employee's expense." On the other hand, the section concerning claim provisions provides that for all claims (1) "Proof must be satisfactory to Sun Life" before benefits will be paid, and (2) benefits will be paid for any period for which

Sun Life is liable "[w]hen Sun Life receives satisfactory Proof of Claim." In addition, long-term benefits cease under the Plan no later than

> [1] the date the Employee fails to provide adequate employment earnings information or proof of continuing Total or Partial Disability as requested; [or] . . . [2] for the first 24 months of Total Disability or for Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of his own occupation . . . [or] after the first 24 months of Total Disability, the date Sun Life determines the Employee is able to perform on a full-time basis all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified . . . .

Relying primarily on the Seventh Circuit's opinion in *Herzberger v. Standard Insurance Co.*, 205 F.3d 327 (7th Cir. 2000), Plaintiff argues that the language of the Plan does not grant the plan administrator discretionary authority to determine facts relating to Plaintiff's claim. In our view, however, common meaning, Tenth Circuit precedent, and the weight of authority elsewhere (including *Herzberger*) support the district court's decision.

Because the issue before us is whether Sun Life properly refused to grant disability benefits based on Plaintiff's depression or back condition, the pertinent language is the requirement that "[p]roof [of long term disability] must be satisfactory to Sun Life." To begin our analysis, we distinguish this language—in particular, the words "satisfactory to Sun Life"—from language in other plans that requires only submission of satisfactory proof, without reference to who must be satisfied. Most circuits that have considered the issue have concluded that the mere

requirement to submit satisfactory or adequate proof of eligibility does not confer discretion upon an administrator. *See Herzberger*, 205 F.3d at 331; *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089-90 (9th Cir. 1999) (benefits provided "upon receipt of satisfactory written proof"); *Bounds v. Bell Atl. Enters. Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8th Cir. 1994) (claims will be paid "after [the administrator] receives adequate proof of loss"). To say that proof must be "satisfactory" may be to say only that it must meet some objective standard—what a reasonable person would find to be satisfactory. *See Herzberger*, 205 F.3d at 330-31; *Kearney*, 175 F.3d at 1089. Construing any ambiguity in plan language in favor of the beneficiary, courts are likely to interpret the term "satisfactory" as conveying such an objective standard, without granting any deference to the factual determinations of the plan administrator. *See Kearney*, 175 F.3d at 1089-90. Indeed, only one circuit (by an 8-6 margin in an en banc decision) has held that language requiring submission of "satisfactory" proof of loss, without specifying who determines the sufficiency of that proof, is by itself adequate to trigger the arbitrary-and-capricious standard of review. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556-57 (6th Cir. 1998).

Going one step further in denying that a plan confers discretion, some courts have held that plan language requiring that a claimant "submit[] satisfactory proof of Total Disability to [the administrator]" does not confer discretion on the

-8-

administrator because the language should be construed as stating only to whom the proof must be submitted, not who must be satisfied. *See Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 839-40 (8th Cir. 2001) (language requiring insured to "submit[] satisfactory proof of Total Disability to us"); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251-52 (2d Cir. 1999) (same). *But see Wilcox v. Reliance Standard Life Ins. Co.*, 175 F.3d 1018 (4th Cir. 1999) (unpublished) (reaching contrary result with respect to same plan language).

On the other hand, when, as in this case, a plan states that the grant or denial of a particular benefit is to be determined by proof satisfactory to the administrator, courts have said that deferential review is proper. *See Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 379 (7th Cir. 1994) ("proof must be satisfactory to us"); *Herzberger*, 205 F.3d at 331 (describing the language in *Donato* as "indicat[ing] with the requisite if minimum clarity that a discretionary determination is envisaged"); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002) (describing plan as stating that "proof must be satisfactory to [the administrator]"; *Perez*, 150 F.3d at 558 (Boggs, J., dissenting) (disagreeing with majority's opinion that plan language granted discretion, but stating that *Donato* plan language "clearly gives discretion[] . . . to the administrator").

Although language in *Kinstler*, 181 F.3d at 252, suggests that the Second Circuit might disagree,[2] we hold that the "satisfactory to Sun Life" language suffices to convey discretion to Sun Life in finding the facts relating to disability. In our view, this language adequately conveys to the Plan participants and beneficiaries that the evidence of disability must be persuasive to Sun Life. Furthermore, to hold otherwise would be at odds with our circuit's case law. We have been comparatively liberal in construing language to trigger the more deferential standard of review under ERISA. In *McGraw v. Prudential Insurance Co. of America*, 137 F.3d 1253, 1259 (10th Cir. 1998), we held that the arbitrary-and-capricious standard governs review of decisions of medical necessity in a plan stating "[t]o be considered 'needed,' a service or supply must be *determined by* [*the administrator*] to meet all of these tests . . . ." (emphasis in original); *cf. Chambers,* 100 F.3d at 825 (finding sufficient discretionary language in plan excluding coverage of certain medical procedures considered experimental "in the judgment of [the administrator]"). Yet *Herzberger*, which supports a finding of discretion under the Plan language in our case, would not find discretion arising from language that merely "requires a determination of eligibility or entitlement by the

---

[2]Language in *Kearney*, 175 F.3d at 1089-90, suggests that the Ninth Circuit also might disagree, but a very recent, unpublished Ninth Circuit decision adopts the same view as our opinion. *See Helm v. Sun Life Assurance Co. of Canada,* 34 Fed. Appx. 328 (9th Cir. 2002).

administrator," 205 F.3d at 332, thereby suggesting a view, which we share, that this case is an easier one for finding discretion than *McGraw* was. *McGraw* also supports our result because the Plan language describing when benefits must cease—"the date Sun Life determines the Employee is able to perform . . ." —would, under the holding in that case, grant Sun Life discretion to halt benefits if it had ever authorized benefits for Plaintiff's depression and back claims. [3]

Because the Plan gives discretion to Sun Life in finding the facts relating to disability, we must uphold Sun Life's decisions as a fact finder unless they were arbitrary or capricious. This standard is a difficult one for a claimant to overcome. As we have explained,

> When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on *any* reasonable basis. The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness -- even if on the low end.

---

[3] We should caution, however, that plan drafters who wish to convey discretion to plan administrators are ill-advised to rely on language that is borderline in accomplishing that task. Given the mobility of workers, the court that interprets the plan may not be the court with jurisdiction over the home office. Also, as more and more courts emphasize the need for clear language to convey discretion, courts that have found borderline language acceptable in the past may assume that plan drafters who have not clarified the language were not intent on conveying discretion. *See Herzberger*, 205 F.3d at 331 (commending to employers "safe harbor" language drafted by the court).

*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citations and quotation marks omitted). Even so, the district court concluded, and we agree, that Sun Life operated the Plan under a conflict of interest because it was both the insurer and administrator of the fund. Accordingly, we must consider and weigh the conflict as "a factor in applying this flexible standard." *Chambers,* 100 F.3d at 827.

### III. Scope of Record to be Reviewed

Plaintiff argues that certain evidence submitted to Sun Life several months after August 9, 1999 (the date of its last denial of benefits), should be considered on review of Sun Life's decision. We disagree. "In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992); *see Chambers*, 100 F.3d at 823. Hence, we will not consider the material submitted by Plaintiff to Sun Life after its decision on August 9, 1999, unless Sun Life acted in an arbitrary or capricious manner by refusing to reopen Plaintiff's claim to consider additional factual submissions.

We find no such error by Sun Life. The Plan states that for long-term disability benefits,

proof of claim must be given to Sun Life no later than 90 days after the end of the Elimination Period [the number of days the employee must be disabled before being eligible to start receiving long-term disability benefits].

If it is not possible to give proof within [this] time limit[], it must be given as soon as reasonably possible. Proof of claim may not be given later than one year after the time proof is otherwise required unless the individual is legally incompetent.

To give Plaintiff the benefit of the latest possible due date for his proof of claim, we assume that his claimed disability caused by a bad back or depression began on the date of his termination of employment in March 1998. (We will hold in the next section of this opinion that Sun Life was correct in deciding that Plaintiff was not covered if the claimed disabilities commenced after his termination from employment.) Because the Elimination Period under the Plan was 180 days, Plaintiff's proof of claim was due, if "possible," within 270 days of his termination from employment—in December 1998, long before his submissions in February and March 2000.

In addition, the Summary Plan Description (SPD) in the Dreyfus Employee Handbook states, "[A]ny appeal must be made within 60 days after you receive notice that your claim has been denied or, if the circumstances are such that you cannot meet the 60-day deadline, as soon as reasonably possible thereafter." On June 8, 1999, Sun Life denied Plaintiff's claim for his back condition. On August 9, 1999, it denied his claim for depression. (The claim was actually a

December 1998 appeal of the October 1998 denial of his depression claim.) Thus, the 60-day period expired by October 9, 1999. As noted by the district court, the evidence Plaintiff sought to submit consists of (1) correspondence in November and December of 1999 from Plaintiff's counsel to Sun Life requesting copies of documents from the administrative file, and (2) affidavits written by Plaintiff and his wife, dated January 31 and March 3, 2000, respectively. Plaintiff offers no reason for his delay, and nothing in the record on appeal suggests that Sun Life foreclosed Plaintiff from an opportunity for an appropriate review of the denial of his claim. *See* 29 U.S.C. § 1133 (setting forth procedural requirements for denial of benefits under employee benefit plans); *see also Sandoval*, 967 F.2d at 381-82 (addressing claim of violation of § 1133). In light of the time limits for submission of a proof of claim and for appealing a denial, Sun Life did not act in an arbitrary or capricious manner by refusing to consider the additional material submitted by Plaintiff.

### IV. Administrator's Decision to Deny Benefits

Finally, Plaintiff argues that Sun Life's denial of his long-term benefits was based on an unreasonable interpretation of the Plan and was not founded on substantial evidence. We first address the claim regarding interpretation of the Plan. We need not decide whether Sun Life had discretion in interpreting the Plan

provisions at issue, because we can affirm Sun Life's interpretation even under *de novo* review.

A.    Interpretation of Plan Provisions

Plaintiff asserts that "[b]oth the Louis Dreyfus Employee Handbook and the LTD policy provide that [his] LTD coverage continued while he was disabled," and that he "is entitled to LTD benefits for all of the disabilities that began during the period he was disabled under the terms of the LTD plan, *i.e.*, from September 17, 1997 to the present." We begin with the policy and then discuss the handbook provisions, which are the pertinent parts of the SPD.

The Plan definitions include the following:

Injury means bodily impairment resulting directly from an accident and independently of all other causes. Any Injury must occur and any disability must begin while the Employee is insured under this Policy.

Sickness means illness, disease or pregnancy. Any disability, because of Sickness, must begin while the Employee is insured under this Policy.

Thus, it is not enough that the disability be caused by an occurrence while the employee is insured; the disability itself must begin while the employee is insured. To determine when an employee is "insured under this Policy," one turns to Plan Section V, entitled "Termination Provisions," which states: "An Employee will cease to be insured on the earliest of the following dates: . . . 6. the date employment terminates . . . ." (We need not decide whether any of the other dates

-15-

would be earlier.)  Taken as a whole, the quoted language clearly expresses the requirement that disability begin before the employee is terminated.

Plaintiff attempts to overcome the clear import of the Plan by pointing to additional language, but the language he relies on is irrelevant to his circumstances. First, he claims that he can benefit from an exception that appears in the provision terminating coverage upon termination of employment.  The provision, the pertinent part of which was previously quoted, states:

> An Employee will cease to be insured on the earliest of
> the following dates:
>
> . . .
>
> 6.      The date employment terminates.  Cessation of Actively
> at Work will be deemed termination of employment, except:
>
> > a.      insurance will be continued for an Employee
> > absent due to a disability during:
> >
> > > i.    the Elimination Period; and
> > >
> > > ii.   any period the premium is waived under this
> > > Policy."

Plaintiff apparently contends that exception (a)(ii) applies to him because Section IV, entitled "Benefit Provisions," contains the sentence "LTD premium payments for a Totally or Partially Disabled Employee are waived during any period LTD benefits are payable under this Policy."

Plaintiff's argument fails, however, because the exception applies only to an "Employee." It states that "insurance will be continued for an *Employee* absent due to a disability . . . ." (emphasis added). The Plan defines "Employee" as "a person who is employed by the Employer, working at least the number of hours shown in Section I, Schedule of Benefits [30 hours per week], and paid regular earnings." The exception benefits an employee who would otherwise be *deemed* terminated for failure to be "Actively at Work," which, as defined by the Plan, generally means working a full workday. Plaintiff does not, and could not, argue that he was an employee after his termination in March 1998.

Next, Plaintiff claims that language in the Plan provides for continued long-term disability coverage for successive periods of disability. In particular, he argues that his psychiatric disability should be covered because the medical evidence shows he suffered from depression while still receiving benefits based on his LTOS disability. He relies on the following provision of Plan Section IV, "Benefit Provisions," under the heading "Successive Periods":

> Successive periods of Total or Partial Disability after a Net Monthly Benefit was payable will be considered a single period if the Employee, in the time between the successive periods, was Actively at Work for less than: (1) six months, if due to the same or related causes; (2) one day, if due to an entirely unrelated cause. The Employee will not have to complete a new Elimination Period. . . .

Plaintiff focuses on the first quoted sentence, ignoring the second. But reading the two sentences together, it is clear that they relate only to how the

-17-

Elimination Period is calculated. Ordinarily, when an employee becomes totally disabled, the employee cannot start receiving long-term disability payments under the Plan until the disability has lasted 180 continuous days (the Elimination Period). Under the above-quoted language, however, the employee need not wait that period to begin receiving benefits for a second disability if (1) the new disability has a cause related to the cause of the original disability and begins within six months of the end of the original disability, or (2) the new disability begins within a day of the end of the original disability. This language says nothing about what disabilities are covered by the Plan; it assumes the second disability is covered and just sets forth an exception to the usual Elimination Period requirement. In particular, the language applies only if the person suffering the second disability is still an employee. Our reading of the provision is confirmed by the SPD, which states:

**RECURRING DISABILITIES**

If LTD benefits stop because you are no longer disabled and, within six consecutive months after you return to your regular job, the same or a related disability condition recurs, LTD benefits will resume right away. If the condition recurs after you have been back on the job on a full-time basis for six consecutive months or longer, a new 180-day waiting period will apply before LTD benefits start again.

We now turn to Plaintiff's contention that the SPD in the Employee Handbook confers coverage for disabilities that arise during a prior disability. Although he cites to two pages in the handbook, he does not refer to any specific

-18-

language other than the sentence, "All benefits under the Program will end for you and your eligible dependents if and when you become a part-time employee or your employment terminates, unless you are eligible for LTD benefits." Plaintiff's error is to confuse continuation of benefits with continuation of coverage. The quoted sentence merely informs readers that disability payments—the benefit—can continue even after one leaves employment. It does not say that disability insurance—the coverage—continues after one leaves employment. In other words, once one leaves employment, one is no longer covered for a new disability that arises. Indeed, a chart on the same page as the quoted sentence states that for long-term disability, upon termination of employment "Coverage stops."

Furthermore, the handbook declares: "If there is any discrepancy between this SPD and the actual plan documents, the discrepancy is unintentional, and your rights will be determined in accordance with the plan documents." We have held that "[w]here the SPD incorrectly describes benefits in the plan, to secure relief, [the claimant] must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1519 (10th Cir. 1996) (internal quotation marks and citation omitted). Plaintiff has not suggested any detrimental reliance or prejudice.

Thus, we agree with Sun Life that Plaintiff is not entitled to coverage under the Plan unless his disability began while he was still employed by Dreyfus.

B.    Sun Life's Fact Finding

Having construed the Plan provisions, we now address whether Sun Life was arbitrary or capricious in determining that Plaintiff had not satisfied the requirements for coverage of his claimed disabilities arising from a bad back and depression.  The issue with respect to each claim is whether Plaintiff was disabled by the condition by the time of his termination from employment in March 1998. The Plan states:

> Total Disability or Totally Disabled means during the Elimination Period and the next 24 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation.  After benefits have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified by education, training or experience.

With respect to the bad-back claim, it is enough to note that (1) when Plaintiff saw an orthopedic surgeon in October 1998, he told the doctor that although he had injured his back in the automobile accident in July 1997, his back "actually began to hurt, however, in July 1998"; and (2) both the surgeon who operated on Plaintiff's back and Sun Life's consulting physician attributed Plaintiff's back pain to a congenital condition unrelated to the accident.  Even if the back pain eventually became disabling, Sun Life could rationally find that it was not disabling before Plaintiff's employment was terminated in March 1998.

Turning to the depression claim, Sun Life first learned of a possible claim based on depression when it received a letter written by Plaintiff's surgeon, Dr. Michael Reif, dated May 15, 1998. The letter included the following three sentences:

> "Because of [Plaintiff's] chronic pain syndrome, he has become exceedingly depressed and actually, [sic] has even expressed some suicidal thoughts on occasion. He is on antidepressant medication at this time. Because of his depression and ongoing pain which now may be due to entrapment of neurovascular structures at the elbow level, he is unable to work."

Sun Life wrote Dr. Reif on August 17 to request further information regarding Plaintiff's depression, including the onset date of Plaintiff's complaints, the medication he was taking, and the name of any treating psychiatric specialist. Dr. Harrison Smith, a clinical psychologist, responded by letter a week later. He had been working with Plaintiff since his accident and was currently seeing him biweekly. He wrote:

> [Plaintiff] has struggled to overcome the symptoms, both physical and emotional, brought on by the accident. He has lost his job, which has contributed an additional emotional stressor. He has struggled with depression and was suicidal as recently as April of this year. He began a regime of psychotropic medication at that time, and his functioning has improved somewhat.

On September 3, 1998, Sun Life wrote Dr. Smith to request "a copy of [Plaintiff's] complete medical record, including but not limited to the following:

– complete intake evaluation including psychosocial and substance abuse history;

- development, precipitants and perpetuating factors of current disabling condition;
- current symptoms, including frequency, severity and impact on ability to work;
- existence of prior psychiatric decompensation and/or treatment;
- existence of other circumstances (job, family, financial, legal, etc.) or medical conditions that affect disability or treatment;
- relevant history, family or personal dynamics;
- **all progress/treatment notes**;
- motivation level with respect to return to occupation;
- the nature of the current treatment program including dates, medications prescribed, dosages and patient's compliance and response;
- plans for future course of treatment;
- DSM IV multiaxial diagnosis (form enclosed) and
- current mental status evaluation."

Dr. Reif and Dr. Smith provided additional records and comments later that month.

On October 19 Sun Life denied Plaintiff's disability claim. The ground for denying disability due to a mental/nervous condition (which is not the ground Sun Life ultimately relied upon) was that he "did not begin seeing a specialist for his mental/nervous condition until February, 1998," and the policy stated that no benefit would be provided for "Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care." Plaintiff appealed by letter dated December 15, 1998, and Sun Life referred the claim to Dr. Ronald Pies, a psychiatrist, on April 23, 1999. Sun Life wrote Plaintiff's attorney on April 27, stating that it had "partially completed" its evaluation of the appeal and would need "clarification of the onset of a psychiatric condition severe enough to preclude him from his occupational duties." The letter went on to say

that Sun Life would request records from Dr. Lowery, Plaintiff's treating psychiatrist, and also would seek clarification of Dr. Smith's illegible records. It then added, "If you wish to assist in the process, or add any additional information with regard to his psychiatric condition, please feel free to do so." Sun Life later obtained Dr. Lowery's records, had Dr. Pies interview Dr. Smith, and obtained a psychiatric assessment form from Dr. Lowery. After Dr. Pies conducted another medical review, Sun Life denied benefits by letter dated August 9, 1999, on the ground that his coverage terminated "prior to the incur date of his substantiated psychiatric related incapacity."

The information acquired by Sun Life shows that Plaintiff's depression claim is a substantial one. Plaintiff saw Dr. Smith on February 16, 1998, at which time his wife reported that he slept all the time and was depressed. Dr. Smith had further contact with the Nances by telephone or office visit on March 4, April 2, and April 10. Also on April 10, Dr. Jim Lowery, a psychiatrist, saw Plaintiff on a referral from Dr. Smith "to evaluate symptoms of depression with suicidal ideation." Plaintiff reported to Dr. Lowery that his job had been terminated on March 13 and he had been denied long-term disability. He said he had been considering suicide for two to three weeks. Dr. Lowery advised him to continue seeing Dr. Smith and to return in two months.

There is little doubt that Plaintiff was emotionally troubled when his employment was terminated. The question is whether he had disabling depression at that time. Given that termination from employment and the simultaneous discontinuation of short-term disability benefits would be emotionally traumatic to anyone, it would not be unreasonable to seek specific information regarding Plaintiff's mental health at the time of termination, rather than a few weeks later. This is what Sun Life did.

Evidence of Plaintiff's mental condition at the time of termination was scanty. Dr. Lowery, who did not see Plaintiff until April 10, could not provide that information. One doctor who saw Plaintiff during the pertinent period was Dr. Reif, Plaintiff's surgeon. He reported to Sun Life: "While it is not clear when I began discussing some depression with [Plaintiff], he clearly has had depressive symptoms and difficulty sleeping and I prescribed Elavil on February 2, 1998, which, in my mind, was to help with pain relief, but with chronic pain, depression is certainly a factor." His office notes for February 2, February 16, and March 16, 1998, did not, however, mention depression. His notes for April 13 state:

> He is currently having trouble sleeping again because he thinks of the pain. He actually can work for 30 hours at a time without sleeping and then crashes and sleeps for long periods of time, so I think his schedule is really fouled up and he needs to work on some of that behavioral modification in his own personal life.

-24-

Dr. Reif's notes from July 28, 1998, say that "[Plaintiff] is sleeping better, although depressed," and he takes an antidepressant prescribed by Dr. Lowery.

The best evidence would probably be Dr. Smith's office notes, but they are almost totally illegible, and he declined Sun Life's request to transcribe them. He did, however, send a letter on September 22, 1998, describing Plaintiff's current condition and stating that "[h]e is clearly disabled." He also agreed to a telephone interview sometime after April 27, 1999. In his interview with Sun Life consulting psychiatrist Dr. Ronald Pies, he stated that his September letter "generally characterized [Plaintiff's] overall condition during the period" from February to September 1998. But he was not more precise about the evidence of Plaintiff's symptoms prior to his termination from employment.

In short, there was minimal evidence of depression, much less disabling depression, in the records of Dr. Reif and Dr. Smith at the pertinent time, and their oral opinions regarding Plaintiff's disability were both vague and many months after the fact. In our view, Sun Life could reasonably determine that the evidence submitted by Plaintiff (which was significantly supplemented by Sun Life's own efforts, such as the interview with Dr. Smith) was insufficient to establish that he suffered from disabling depression at the time of his termination from employment. Even taking into account Sun Life's conflict of interest, we hold that Sun Life's denial of benefits was not arbitrary or capricious.

We briefly note one final argument by Plaintiff. He asserts that Sun Life modified the Plan's definition of total disability by requiring that proof must be by "objective contemporaneous documentation." That phrase, however, does not appear in any rulings by Sun Life on Plaintiff's claims. It appears only in Dr. Pies' reports. Plaintiff presents no evidence that Sun Life imposes an absolute requirement of "objective contemporaneous documentation" of disability, so we have no occasion to decide whether such a requirement would violate the Plan.

The district court did not err in granting Sun Life summary judgment. The judgment is AFFIRMED.