**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

J. CHARLES GROSVENOR,

      Plaintiff - Appellant,

v.

QWEST COMMUNICATIONS
INTERNATIONAL; QWEST
DISABILITY PLAN,

      Defendants - Appellees.

No. 05-4061
(D.C. No. 03-CV-897-DS)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **SEYMOUR**, and **HARTZ**, Circuit Judges.

Plaintiff-Appellant J. Charles Grosvenor appeals from the district court's grant of summary judgment in favor of Qwest Corporation and the Qwest Occupational Short Term Disability Plan (the "Plan"), collectively ("Qwest") arising out of Mr. Grosvenor's claim for disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Background

Mr. Grosvenor was an employee of Qwest Corporation as a Team Leader in the Wholesale Provisioning Department. His responsibilities included frequent travel and a wide variety of managerial, training and administrative responsibilities. Mr. Grosvenor was a participant in the Plan, a self funded employee welfare benefit plan, governed by ERISA. Qwest was the sponsor of the Plan, which designated the Qwest Employee Benefits Committee ("EBC") as the Plan administrator. The EBC had discretion under the Plan to grant or deny benefits. The EBC delegated its duties as administrator to the Health Services Group. Qwest employed Catherine Parks, a registered nurse, to review short term disability ("STD") benefit claims. She was not a corporate officer, and her performance evaluations were not tied to denial of claims.

In September 1999, Mr. Grosvenor began to suffer from loss of balance, tinnitus, headaches and vertigo. Mr. Grosvenor began to experience memory loss and a decreased ability to concentrate. He continued to work at Qwest until October 23, 2000. At that point, he concluded that he was no longer able to continue until his symptoms could be brought under control.

Under the Plan, participants are eligible for STD benefits if they are "Disabled" and if they fulfill certain requirements under Section 4.1 of the Plan. The Plan defines "Disabled":

"Disabled" or "Disability" means the circumstance when a Participant

is unable to perform the normal duties of his regular job or other job duties in a modified capacity due to an injury or illness which is supported by objective medical documentation.

Aplt. App. at 32. The Plan does not definite "objective medical documentation, but defines "objective findings" as "observable, measurable and reproducible findings of symptoms, such as, but not limited to, x-ray reports, elevated blood pressure readings, and lab test results." Id. at 34.

Section 4.1 of the Plan outlines the requirements for qualification for benefits:

4.1 Eligibility for Benefits. Participants are eligible for STD benefit payments under the Plan if they are Disabled and they fulfill all of the following requirements and obligations:
. . . (e) Provide documentation supporting total Disability (or Disability requiring reduced hours) to Health Services within a reasonable period not to exceed three weeks from the first day of absence, and after each follow-up visit with a Provider (or as often as requested by Health Services). Documentation must be from the original dated medical record and support the claim of total Disability (or partial Disability requiring reduced hours, if appropriate). Such documentation shall include: the patient's subjective complaints or "story of illness"; the objective, measurable or reproducible findings from physical examination and supporting laboratory or diagnostic tests; assessment or diagnostic formulation; and a plan for treatment or management of the problem. The documentation must be legible and sufficient to allow another trained medical professional to review the case, and see how the original Provider came to his determination and decisions.

Aplt. App. at 39-40.

Ms. Parks communicated with Mr. Grosvenor regarding his illness and the terms of the Plan and provided him with an STD packet. This packet included a form for his physician to complete. The form indicated the Plan's definition of disability and requirement for objective medical documentation. In November,

2000, Mr. Grosvenor's primary care provider, Dr. Taylor, identified his condition as "viral labyrinthitis with residual nerve damage" and wrote "unknown" as to whether Mr. Grosvenor could return to work. Id. at 87-88. Mr. Grosvenor also submitted office visit notes, and the results of his October 5, 2000 Magnetic Resonance Imaging ("MRI"), which was normal. Id. at 92.

Ms. Parks also received medical records from Mr. Grosvenor's neurologist, Dr. Arif Chowdhury. In an October 26, 2000 letter to Dr. Taylor, Dr. Chowdhury observed that Mr. Grosvenor's "sinus x-rays, CT scans and MRI of the brain" were "unrevealing except for mild to moderate sinusitis which has been treated with antibiotics." Id. at 94. Dr. Chowdhury reported that Mr. Grosvenor had "reproducible dizziness with neck extension and mild weakness of the biceps, deltoid and shoulder abduction" and unsteady gait in heel-to-toe walk. Id. at 95. Dr. Chowdhury performed an MRI of the cervical spine, and observed "mild broad-based bulging at C3-4 and centrally and biased to the left bulging at C4-5" but the doctor was unsure whether the bulging was a contributing factor to the dizziness. In December 2000, Dr. Leland Johnson submitted a Disability Medical Certificate diagnosing Mr. Grosvenor with chronic dysequilibrium but providing no information as to his ability to return to work.

With that information, Ms. Parks informed Mr. Grosvenor by letter dated January 16, 2001, that she denied his STD benefits claim because he failed to provide sufficient objective medical documentation to establish disability. Mr.

Grosvenor subsequently submitted additional information to Ms. Parks, including: (1) an evaluation report from the IHC Hearing and Balance Center reporting that Mr. Grosvenor had a very mild vestibular-somatosensory dysfunction pattern, which indicated he "may occasionally be unable to maintain his balance". The report observed that this was the sole abnormality and that Mr. Grosvenor's motor control and adaptation tests were within normal limits, id. at 108-109, and (2) a Disability Medical Certificate from Dr. Worthington, a Ph.D. with the University of Utah Department of Otolaryngology that diagnosed Mr. Grosvenor with mild vestibular-somatosensory dysfunction and concluded that he could return to work with the restriction that he not be on heights, ladders or platforms. Id. at 111-112.

Dr. Anne Hazelton examined Mr. Grosvenor's file and concurred with the denial of benefits, finding that he was not sufficiently impaired, in light of only one abnormality with mild restrictions not relevant to his work. Id. at 114-116. Both Dr. Chowdhury and Dr. Taylor wrote letters to the Secretary of Qwest Appellate Reviews on Mr. Grosvenor's behalf. Both suggested that Mr. Grosvenor posed a threat of injury to himself and his co-workers due to his trouble balancing, and recommended he be placed on STD. Mr. Grosvenor formally appealed his denial of benefits by letter dated March 5, 2001 pursuant to the Plan's appellate provisions. Dr. Barry Kern, Appellate Reviewer, upheld the denial of Mr. Grosvenor's claim for STD benefits, concluding that the symptoms

of dizziness and headache lacked an exact etiology after extensive diagnostic studies and the findings were not consistent with continued disability.  By letter dated May 31, 2001, Mr. Grosvenor was informed that the denial of benefits was upheld on appeal because the evidence did not support a finding of disability.  Mr. Grosvenor continued to submit further information, which Qwest declined to consider.

Mr. Grosvenor filed suit in October 2003 alleging a wrongful denial of STD benefits.  The parties filed cross motions for summary judgment.  The district court granted Qwest's motion.  It recognized that the Plan's decision would be upheld unless arbitrary and capricious, and concluded that substantial evidence supported the Plan's decision.  On appeal, Mr. Grosvenor argues that Qwest was arbitrary and capricious in evaluating his STD claim and the district court erred in holding otherwise.

Discussion

We review a grant of summary judgment de novo, applying the same legal standard used by the district court.  Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d 1281, 1287 (10th Cir. 2005).  Summary judgment is appropriate if there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c); Kimber v. Thiokol Corp., 196 F.3d 1092, 1097 (10th Cir. 1999).  We resolve all ambiguities and draw all factual inferences in favor of the non-moving party.  Zurich, 426 F.3d at

1287.

The Plan Administrator's decision to deny benefits is subject to an arbitrary and capricious standard of review. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The district court's determination of whether a plan administrator's decision is arbitrary and capricious is a legal conclusion subject to de novo review. Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002). Under the arbitrary and capricious standard, we must uphold the plan administrator's decision if it is grounded on any reasonable basis, and that basis need not be the only logical one or even the best one. Kimber, 196 F.3d at 1098; Nance v. Sun Life Assur. Co. of Canada, 294 F.3d 1262, 1269 (10th Cir. 2002). The administrator's decision need only fall "somewhere on a continuum of reasonableness—even if on the low end." Kimber, 196 F.3d at 1098 (internal quotation omitted).

Indicia of an arbitrary and capricious decision includes the lack of substantial evidence. Caldwell, 287 F.3d at 1282. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. Id. It requires more than a scintilla but less than a preponderance. Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992). Substantiality is based on the record as a whole. Caldwell, 287 F.3d at 1282. In applying this arbitrary and capricious standard, we are "limited to the 'administrative record'—the materials compiled by the administrator in the course

of making his decision." Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1003 (10th Cir. 2004) (quoting Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002)).

When there exists a conflict of interest or procedural irregularity, less deference to the plan administrator's decision is warranted. Fought, 379 F.3d at 1007. Mr. Grosvenor does not claim a conflict of interest existed here, but rather argues that "[t]he haste with which Qwest pushed Grosvenor's claim through the initial evaluation and subsequent appeal process, together with its evident lack of interest in investigating the objective medical documentation . . . [and its selective review] of Grosvenor's medical records," Reply Br. at 3, constituted serious procedural irregularities sufficient to lower the deference we accord. He reminds us that in Gaither v. Aetna Life Ins. Co., 388 F.3d 759, 774-75 (10th Cir. 2004), we stressed that a plan fiduciary must seek to get at the truth of the matter, rather than behave in an adversarial matter and reject claims when a little more evidence might substantiate such a claim.

We do not perceive serious procedural irregularities in this plan procedure as envisioned by Fought, 379 F.3d at 997. As we read Fought, the serious procedural irregularity included the lack of an independent review in a complex case where the plan administrator operated under an inherent conflict of interest and resisted discovery on that conflict. A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the

claimant on conflicting evidence. As such, we apply the "pure" arbitrary and capricious standard.

In applying this standard of review, we consider the evidence before the Plan Administrator at the time he made the decision to deny benefits, unless the Plan acted in an arbitrary and capricious manner by refusing to reopen the claim and consider additional factual submissions. See Nance, 294 F.3d at 1269. Mr. Grosvenor argues that the Plan was arbitrary and capricious in refusing to consider evidence received after the May 31, 2001 denial letter. Aplt. Br. at 32.[1] We disagree.

The Plan required Mr. Grosvenor to provide evidence of disability "within a reasonable period not to exceed three weeks from the first day of absence, and after each follow-up visit with a Provider," Aplt. App. at 39-40, and provided that Mr. Grosvenor had 60 days from the denial of his claim for benefits to appeal. Id. at 57. There is no provision in the plan for multiple appeals or a provision requiring a continuous opportunity to supplement. Moreover, Mr. Grosvenor's argument that the Plan's time frame "will often make the promise of disability benefits illusory" is unpersuasive. Here, Mr. Grosvenor needed to produce evidence within a reasonable time after he concluded that he was unable to continue working until his symptoms could be brought under control. That

---

[1] Qwest is incorrect that Mr. Grosvenor never raised this argument before the district court and thus we should consider it waived. Aplt. App. at 210-212.

evidence could be supplemented during appeal. These are not unreasonable procedures. See Sandoval, 967 F.2d at 381 ("If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence."). We are wary of rewriting the terms of the plan so as to require that a plan administrator consider all evidence (even that submitted after a final decision) presented prior to litigation. See Vega v. Nat'l Life Ins. Serv., 188 F.3d 287, 300 (5th Cir. 1999) (en banc). ERISA's fiduciary provisions do not require a plan administrator to consider evidence submitted after a final benefits decision is made. See 29 U.S.C. § 1104. When an administrator follows the terms of the plan, we will not hold that to be arbitrary and capricious. See Nance, 294 F.3d at 1269.

Examining that evidence before the Administrator when it denied Mr. Grosvenor's appeal on May 31, 2001, see Hall, 300 F.3d at 1201, we now turn to the question of whether that denial was arbitrary and capricious. Though Mr. Grosvenor's subjective explanation of his symptoms was detailed, see, e.g., Aplt. App. 278-81, we recognize that the Plan was well within its rights to consider the etiology of those symptoms and any objective support. Mr. Grosvenor's MRIs and CT scans returned as "unremarkable" and "normal." Id. at 92-98. The IHC Hearing and Balance Center reported balance difficulties as a result of mild vestibular-somatosensory dysfunction, but concluded Mr. Grosvenor could return to work as long as he did not work on any "heights, ladders or platforms." There

- 10 -

is no dispute that Mr. Grosvenor's responsibilities did not include such work.

Mr. Grosvenor argues that the Plan improperly ignored the opinions of his treating physicians that he was disabled. It is clear the Administrator considered, but did not find these opinions persuasive because they were unsupported by the "objective" medical documentation that the Plan requires and indeed, neither doctor explained why Mr. Grosvenor's balance difficulty would preclude him from performing any of his managerial responsibilities. The Administrator's decision concerning the weight to be given such opinions after considering the underlying evidence or lack thereof differs from ignoring them. Moreover, there is no requirement that the treating physician's conclusion trump that of, for example, the IHC, which reported, after extensive testing, that Mr. Grosvenor could return to work. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). In Kimber, we concluded that a rational plan administrator could reject a physician's reports when there was no accompanying data to support that conclusion. 196 F.3d at 1099. Mr. Grosvenor's treating physician reports included no objective medical documentation, such as x-rays, MRIs or CT scans, to support their conclusion, and as in Kimber, the Administrator could decline to

credit them.  Given our standard of review, the district court's judgment must be

AFFIRMED.


                              Entered for the Court


                              Paul J. Kelly, Jr.
                              Circuit Judge