**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 20 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JULIAN DYCUS, WILLIE LEE JONES,
JOEL GAUSE, JAMES MASHAW,
WARREN G. HARDIN, ARTHUR
PRICE, JIMMY R. JANES, BILL M.
REA, FLOYD M. BARTLETT,
EDWARD M. LEDFORD, GEORGE
HAMILTON, TRUMAN O.
FERGUSON, JAMES N. STANLEY,
DOLPHIE T. MEIERS and JOAQUIN R.
BALDERAMA,

        Plaintiffs-Appellants,

    v.

PENSION BENEFIT GUARANTY
CORPORATION, a United States
corporation,

        Defendant-Appellee.

No. 96-2146

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-95-401)

---

W. T. Martin, Jr., Carlsbad, New Mexico, for Plaintiffs-Appellants.

Nancy S. Heermans, Senior Counsel (James J. Keightley, General Counsel, Jeffrey B.
Cohen, Deputy General Counsel, Deborah West, Senior Assistant General Counsel,

Marc A. Tenenbaum and Sara B. Eagle, Attorneys, with her on the briefs), Pension Benefit Guaranty Corporation, Washington, D.C., for Defendant-Appellee.

Before SEYMOUR, Chief Judge, LOGAN and MURPHY, Circuit Judges.

LOGAN, Circuit Judge.

Plaintiffs appeal the district court's judgment affirming a decision by defendant Pension Benefit Guaranty Corporation (PBGC) denying plaintiffs' request for certain pension benefits.[1] Plaintiffs, hourly employees at a potash mine formerly owned by Potash Company of America (PCA), brought this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, claiming entitlement to early retirement benefits due to an alleged permanent shutdown of the mine.

---

[1] The PBGC is a federal agency charged with administering the pension plan termination insurance provisions of ERISA. Employers who provide ERISA qualified pension plans for their employees pay to PBGC annual premiums which are used to guarantee benefits to qualified employees when a plan is terminated. See 29 U.S.C. §§ 1302, 1305, 1322, 1322a; Pension Comm. for Farmstead Foods Pension Plan for Albert Lea Hourly Employees v. Pension Benefit Guar. Corp., 991 F.2d 1415, 1417-18 (8th Cir. 1993).

I

On December 1, 1985, the potash mine was shut down purportedly only temporarily until January 7, 1986, for the purpose of reducing inventory. On December 30, however, PCA announced an extension of the shutdown "until such time that our product warehouse inventories are reduced to a more manageable level." II App. 209. At the same time, PCA announced that a sale of the mine was imminent.

On January 1, 1986, PCA sold the mine to Thomas Lundberg, who rapidly conveyed the mine and all its assets to Lundberg Industries, Ltd. (LIL). Although Mr. Lundberg agreed to offer comparable employment to existing employees, LIL immediately cut wages and benefits for those employees who continued to work during the shutdown. Before the mine resumed operations, LIL required all former PCA employees to apply for positions with LIL. The mine remained shut down until March 1986, when it resumed operations under the new management. Those former PCA employees hired by LIL were treated as new hires, given lower wages, reduced benefits and new seniority dates, and they were placed on sixty-day probation. LIL assumed responsibility for the existing pension plans.

In September 1986, LIL announced it was terminating three pension plans in effect at the mine, and in December 1986, it filed for the requisite approval from the PBGC to

do so. See 29 U.S.C. § 1341. LIL was later adjudged insolvent, and the PBGC assumed administration of the pension plans.[2] See id. § 1342.

Plaintiffs Dycus, Bartlett, Ferguson, Gause, Rea, Meiers, Stanley, Balderama, and Hardin, all of whom were hired by LIL, filed for early retirement benefits under the plan's provision for benefits in the event of a "termination of service" due to "permanent shutdown." The PBGC denied early retirement benefits to these applicants because it determined that they had not experienced a termination of service and there had been no permanent shutdown of the mine. Plaintiff Jones, who was not hired by LIL--allegedly because he was not qualified--made a similar application. In denying Jones' application, the PBGC determined that although Jones had experienced a termination of service, his termination was not the result of a permanent shutdown of the mine. Plaintiffs appealed to the district court, which affirmed.[3] On appeal to this court, plaintiffs contend that the PBGC's decision to deny early retirement benefits under PCA's terminated retirement plan was arbitrary, capricious, and contrary to law.

---

[2] Mr. Lundberg was later found guilty of embezzling over nine million dollars from the company's pension plan.

[3] The remaining plaintiffs, Hamilton, Janes, Ledford, Mashaw, and Price, all of whom had been hired by LIL, joined the district court action without exhausting their administrative remedies. The PBGC waived the exhaustion requirement, however, because their claims were identical to those brought before the PBGC by the plaintiffs other than Jones.

II

A

The PBGC is an administrative agency, and its decisions generally are reviewable under the standard set out in the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706. A decision of the PBGC must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706(2)(A); see also Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994). In reviewing agency action under this standard the court must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Olenhouse, 42 F.3d at 1574 (footnote omitted). The challenged agency action involves construction of the terms of a pension plan, which we generally review de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). But if a pension plan itself "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," id. at 115, the administrator's or fiduciary's decision is entitled to review under the deferential arbitrary and capricious standard. See, e.g., Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1505 (10th Cir. 1995).

Here the plan administrator (committee) had authority to "decide all questions concerning the application or interpretation of the provisions of the [p]lan." I App. 73. When the PBGC took over the plan as statutory trustee, it had authority to "do any act

authorized by the plan . . . to be done by the plan administrator or any trustee of the plan."

29 U.S.C. § 1342(d)(1)(A)(I). Thus the district court correctly determined that the

decisions of the PBGC were entitled to deferential review under both the APA and

Firestone. We review the district court's legal conclusion de novo. See Averhart v. US

West Management Pension Plan, 46 F.3d 1480, 1485 (10th Cir. 1994).

B

The pension plan at issue contained a "70/80 Forced Termination Retirement"

provision which stated:

> A Member whose Termination of Service is the result of a permanent shutdown of his plant or department shall be entitled to a 70/80 Forced Termination Pension in accordance with Section 5.5 if:
>
> i. he shall have attained the age of 55 years and his combined age and years of Vesting Service shall equal 70 or more, or
>
> ii. his combined age and years of Vesting Service shall equal 80 or more.
>
> However, no employee shall be entitled to receive a 70/80 Forced Termination Pension if such employee has been offered a position with the Company paying at least the same wage rate he was being paid by the Company at the time of permanent shut-down or layoff. An employee who is offered reemployment as aforesaid shall cease to have any rights to a 70/80 Forced Termination Pension and shall be eligible for Plan benefits only under the other sections of this Article 4.

I App. 56-57 (Article 4.5).

The plan defined "Company" as "the Potash Company of America at its Carlsbad,

New Mexico Plant, wholly owned subsidiary of Ideal Basic Industries, Inc. and any other

corporation, division, plant or other entity which adopts the Plan with the approval of the Board of Directors."[4]  Id. at 45.  "Termination of Service" was defined as "the day on which an Employee quits, retires, is discharged, dies while actively employed or otherwise severs his employment status with the Company."  Id. at 51.  The plan does not define "permanent shutdown."  Plaintiffs argue that the extended inventory reduction shutdown of the mine, the temporary layoff of employees, and the eventual sale of the plant constituted a termination of their service due to a "permanent shutdown" of the mine, thus triggering their eligibility for the 70/80 pension benefits.

Plaintiffs argue that they suffered a "termination of service" with PCA sometime in December when the layoff became indefinite.  At that point, PCA was calling it an "extended shutdown" and made no promise of future employment, although the general

---

[4]  On January 1, 1986, the date of the sale to Mr. Lundgren, the definition of "company" was amended to read:

"Company"
        Prior to January 1, 1986, shall mean the Potash Company of America Division of Ideal Basic Industries, Inc. and any other corporation, division, plant or other entity which adopts the Plan with the approval of the Board of Directors.

        On and after January 1, 1986, shall mean Lundberg Industries, Ltd. and any other corporation division, plant or other entity which adopts the Plan with the approval of the Board of Directors.

II App. 412.  Because LIL adopted the plan, under either the old or new definition it would meet the plan definition of "company."

manager's letter stated that "we hope you will be available for continued employment when we do start back into operation." II App. 209-10. Although plaintiffs cite cases holding that long-term and/or indefinite layoffs ended employment, those cases do not deal with pension plans. See, e.g., A.O. Smith Corp. v. Dep't of Indus., Labor & Human Relations, 276 N.W.2d 279, 280 (Wis. 1979) (indefinite layoff, not later strike, severed employment relationship for purposes of unemployment compensation); Texas Employment Comm'n v. E-Systems, Inc., 540 S.W.2d 761 (Tex. Civ. App. 1976) (employment severed by indefinite layoff induced by economic conditions).

In determining there was no termination of service, the PBGC relied heavily on the fact that the new owner, LIL, retained responsibility for the plan. Because the plan defined "company" as any entity that adopts the plan with approval of the board of directors, the PBGC determined that the employees did not suffer a termination of service with the company; i.e., even if they were no longer employed by PCA, they were employed by LIL and thus by the "company." The plaintiffs counter that even before the transfer to LIL the layoff had become indefinite and thus they were no longer employees of the "company." But even assuming the PBGC's determination that plaintiffs did not suffer a "termination of service" was arbitrary and capricious, that would not mean plaintiffs are entitled to the benefits they seek. The PBGC also denied plaintiffs' claims for benefits in part because it determined that no "permanent shutdown" of the plant or departments occurred, as required by Art. 4.5.

The plan did not define "permanent shutdown"; therefore we must defer to the PBGC's interpretation of the term if it is not arbitrary and capricious. See Maez, 54 F.3d at 1504-05. The PBGC determined that although there was a layoff before and after sale of the plant, there was no "permanent shut-down." The PBGC relied on the facts that the successor, LIL, continued the plan, "rehired" most employees, and continued to operate the plant. Based on the language of the plan, this would not be an unreasonable or arbitrary determination. Cf. Brandis v. Kaiser Aluminum & Chem. Corp., 47 F.3d 947, 949-50 (8th Cir. 1995). Plaintiffs argue, however, that our decision in Thorpe v. Retirement Plan of Pillsbury Co., 80 F.3d 439 (10th Cir. 1996), compels a holding that the PBGC's interpretation is arbitrary and capricious.

In Thorpe, we considered a similar dispute involving the interpretation of a provision in an ERISA plan. The plan provided for an early retirement benefit in the event of a "plant closure" for those Pillsbury employees completing twenty-five years of service, but not yet fifty-five years old. Id. at 441. When Pillsbury sold the plant to Cargill, Inc. there was a one-day cessation of production. The plaintiff was rehired by Cargill, and filed a claim for early retirement benefits.[5] The plan administrative board

---

[5] In response to several claims for early retirement, Pillsbury and the union entered into an agreement to amend the plan. The amendment provided, *inter alia,* for an award of early retirement benefits and a lump sum payment of $10,000 to former Pillsbury employees upon attainment of age 55. Those electing to participate in the amendment agreement were required to sign a release in favor of Pillsbury. The plaintiff elected not to sign the release.

denied the claim, finding that the plant had not closed within the meaning of that term in the plan provision. The plaintiff then filed suit in federal court claiming various ERISA violations. The district court granted summary judgment in his favor on the issue of whether the plant closed.

In affirming the district court's decision on this issue, we held that "the proper inquiry requires an analysis of the rights and liabilities assumed by Cargill, as Pillsbury's successor in interest, regarding the contractual relationship between Defendants and Plaintiff." Id. at 443. We noted significant changes in the contractual relationship between the plaintiff and his employer brought about by the change of ownership, including that the purchase agreement (1) did not provide for a transfer of the collective bargaining agreement with the union; (2) did not require Cargill to rehire any of the Pillsbury employees; (3) did not require Cargill to honor any of Pillsbury's terms and conditions of employment; and (4) specifically excluded any assets or liabilities associated with the employee pension plan. We concluded that these alterations precipitated such "dramatic changes in [the plaintiff's] conditions of employment" as to "make[] it clear that the Ogden plant closed, as that term is used in the Retirement Plan." Id. at 443, 444.

Plaintiffs point out that the instant case involved several of the same alterations in the plaintiffs' conditions of employment as in Thorpe: the terms of sale did not require that LIL employ any of PCA's employees; PCA employees were required to apply for

- 10 -

jobs with LIL; LIL did not accept the collective bargaining agreements in effect at the time of sale; LIL was not required to honor any of PCA's terms and conditions of employment, and in fact, LIL cut wages and eliminated benefits, including the health and hospitalization cafeteria plan; LIL terminated the existing profit sharing plan; and LIL eliminated any seniority prior to the date of sale and treated former PCA employees as probationary new-hires for sixty days. Although those types of changes were considerations in Thorpe, we must concentrate on the pension plan itself because the issue is entitlement to benefits under that plan. In Thorpe we stated, "most importantly, [the agreement] refused to transfer the liabilities associated with Pillsbury's Retirement and Welfare Plans." 80 F.3d at 443.

> In short, Plaintiff's coverage under the Retirement and Welfare Plans ceased upon the sale of the plant to Cargill. Accordingly, Plaintiff sensibly joined Cargill's pension, health and accident plans. However, Cargill's benefit plans differed from Pillsbury's Retirement and Welfare Plans. While Pillsbury paid all contributions to the Retirement Plan and paid qualifying employees a benefit upon retirement of $25 per year of company service, Cargill's plan pays qualifying employees a benefit upon retirement of only $19 per year of company service. Pillsbury paid all health premium costs for its Welfare Plan, while Cargill requires employees who choose family coverage to pay $65 per month to participate in the Cargill health and accident plan.

> It is precisely the alteration in the rights and responsibilities of Defendants that makes it clear that the Ogden plant closed, as that term is used in the Retirement Plan.

Thorpe, 80 F.3d at 444 (citations omitted).

Unlike in Thorpe, here LIL assumed responsibility for the assets and liabilities under PCA's existing pension plan. LIL continued the coverage under the plan, and employees "continued to accrue benefits without interruption from November of 1985 when PCA announced the temporary inventory reduction shutdown with attendant lay offs until [] rehired by LIL in March of 1986 and thereafter until accruals were frozen as of July 31, 1986." II App. 143. Thorpe is thus distinguishable.

We must hold that the district court correctly found the PBGC's interpretation that plaintiffs did not suffer a "termination of service" due to a "permanent shutdown" was not arbitrary and capricious. Therefore the district court properly deferred to the PBGC's decision that plaintiffs were not entitled to 70/80 forced termination retirement benefits under the plan.

AFFIRMED.