**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 2, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LOU HODGES,

     Plaintiff - Appellee,

v.

LIFE INSURANCE COMPANY OF
NORTH AMERICA, a Pennsylvania
insurance company,

     Defendant - Appellant.

No. 18-1279

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-00958-WYD-NYW)**
_____

Jack M. Englert, Jr., Holland and Hart LLP, Greenwood Village, Colorado, for Appellant.

David Lichtenstein (Matthew Molinaro, with him on the brief), Law Office of David Lichtenstein, LLC, Denver, Colorado, for Appellee.
_____

Before **MATHESON**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Lou Hodges submitted a claim for long-term-disability (LTD) benefits to Life

Insurance Company of North America (LINA) through his employer's group-

insurance plan. Although LINA approved his claim, Hodges asserted that LINA

should have classified him as a "sales" employee under the group-insurance policy, which would have entitled him to more benefits. This led Hodges to sue LINA. The district court remanded for further factfinding, but LINA once again reached the same result. The district court then reversed LINA's decision, concluding that Hodges qualified as a salesperson under the policy. LINA now appeals that ruling. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Until 2012, Hodges worked for Endo Pharmaceuticals, Inc. as a cryotherapy technician. That year a degenerative eye condition forced him to retire. He participated in Endo's employee-welfare-benefit plan, for which Endo had appointed LINA as the administrator. In 2011, LINA issued to Endo a group LTD insurance policy (the Policy), governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1000–1461. Under "Claims Procedures," the Policy names LINA the fiduciary for deciding claims as well as appeals of denied claims. Appellant's App. vol. 2 at 312. The Policy allows LINA "45 days from the date it receives a claim for disability benefits . . . to determine whether or not benefits are payable in accordance with the terms of the Policy." *Id.*

The Policy divides employees into two classes: Class 1, which includes "[a]ll active, Full-time and part-time Employees of the Employer, excluding Sales personnel, regularly working a minimum of 20 hours per week"; and Class 2, which includes "[a]ll active, Full-time Employees of the Employer classified as Sales Personnel regularly working a minimum of 20 hours per week." *Id.* at 290. The

2

Policy entitles all covered employees to monthly disability payments worth 60% of their average pre-disability earnings, but it defines the pay of sales personnel more broadly than that of non-sales personnel. Specifically, the Class 2 definition of earnings includes payments "received from bonuses or target incentive compensation bonus[es]," but the Class 1 definition "does not include amounts received as bonus[es]."[1] *Id*. Despite favoring sales personnel in the provision of benefits, however, the Policy defines neither "sales" nor "sales personnel."

Before leaving the company, Hodges submitted a claim under the Policy. After granting him short-term-disability benefits, LINA informed Hodges that it would begin evaluating his eligibility for LTD benefits. LINA eventually concluded that Hodges was medically eligible for LTD benefits, but later sought information from Hodges and Endo about Hodges's job description and duties to determine whether he qualified as "sales personnel" under the Policy. In a telephone interview, Hodges explained to a LINA claim manager that "he was a technician, but often times did things to sell the compan[y']s products." *Id.* at 516. And in an e-mail to another LINA claim manager, an Endo representative "confirmed" that Hodges "received monthly sales bonuses based on the number of cases he treated," which totaled "$9[,]800 for the nine months he worked in 2011." *Id.* vol. 5 at 1226. But the representative also stated, "These earnings are not part of the overall bonus or

---

[1] Both the Class 1 and Class 2 definitions of earnings specifically exclude "commissions, overtime pay, or extra compensation." Appellant's App. vol. 2 at 291, 294.

[incentive compensation] program at Endo and were not included in the premium calculation." *Id.*

On March 21, 2012, LINA informed Hodges that it had approved his claim for LTD benefits but that it deemed him a Class 1 employee, not a Class 2 salesperson. Hodges objected to this classification, arguing that he "sold products while out in the field" and that the classification would significantly reduce his benefits.[2] *Id.* vol. 2 at 494. About 70% of Hodges's earnings came from his base salary, and about 30% came from sales-driven compensation, including bonuses.

In November 2012, Hodges filed an administrative appeal asking LINA to reconsider its decision to classify him as a Class 1 employee. Hodges attached several supporting documents to his appeal. First, he submitted e-mails from two senior Endo officials referring to the "bonuses" that Hodges and other cryotherapy technicians had earned selling the company's products and services. *Id.* vol. 4 at 1044–46. Second, he submitted e-mails from senior Endo staff emphasizing the importance of marketing the company's products. In one such e-mail, Allyn Chung, Endo's Senior Director of Cryo Operations, wrote to Hodges and other employees, "I cannot stress enough the importance of making regular visits to your physician[s'] offices and helping to market the technology." *Id.* at 1039. In another e-mail (subject: "job descriptions and 2011 goals"), Chung declared that cryotherapy technicians' goals for the year included a "requirement to submit a minimum of [one] lead a

---

[2] Hodges estimates that he would collect an additional $902 per month if he were classified as a Class 2 salesperson.

4

month for new cryo[therapy] users, new applications for existing cryo[therapy] users, or any other lead for any of our business lines." *Id.* at 1042. Third, Hodges submitted pay stubs withholding a higher rate of the payments for federal taxes than for his regular income.[3] Finally, Hodges submitted the company's official job description of a cryotherapy technician. The job description's "summary of purpose" requires cryotherapy technicians to "[a]ssist in the growth and development of existing and new business lines," though none of the job's "essential functions" involve sales responsibilities. *Id.* at 1035–36. Based on this evidence, Hodges complained to LINA that "Endo appears to have recharacterized . . . [his bonus] compensation as commissions solely for the purpose of reducing [LINA's] exposure, and presumably reducing Endo's indirect exposure . . . ." *Id.* at 1032.

Before deciding the appeal, LINA asked Endo for more information about Hodges's job classification and duties. Lori Capozzi, Endo's benefits consultant, responded that "Hodges was not classified as 'sales,'" that "[h]e worked in a mobile unit that permitted him to perform medical tests at doctor[s'] offices based on a pre-determined schedule," and that "he was paid a 'bonus' for those additional tests." *Id.* at 949, 1008. On January 7, 2013, LINA affirmed its initial decision. LINA acknowledged that the Policy did not define "sales personnel" but explained:

> The Employer has confirmed Mr. Hodges['s] occupation as a CryoTherapy Technician is not classified as a sales position with the employer. According [to] the Employer, Mr. Hodges worked in a mobile unit that permitted him to perform medical tests at doctor[s'] offices

---

[3] The IRS treats bonuses as "supplemental wages" and taxes them differently than "regular wages." *See* 26 C.F.R. § 31.3402(g)-1.

based on a pre-determined schedule. If he was able to incorporate and schedule a few more tests during his work week, he was paid a bonus for those additional tests. According to the [d]efinition of Covered Earnings under Class 1, earnings do not include bonus[es], commissions, overtime pay or extra compensation, [and] therefore would not be considered as part of the Disability Benefits Calculation.

*Id.* vol. 3 at 833.

On March 28, 2013, Hodges sent LINA a letter requesting further reconsideration of his Class 1 classification and protesting that "the extent of [LINA's] consideration" of his first appeal "involved a single e-mail to Endo's benefits consultant Lori Capozzi inquiring into whether the company classified Mr. Hodges's position as a sales position." *Id.* vol. 4 at 948. LINA responded that it "w[ould] accept two (2) appeals from a claimant for any single denial" but that "the second request for appeal is a voluntary level of appeal" and requires "additional information that has not previously been reviewed." *Id.* vol. 3 at 606. So Hodges wrote back, attaching several more documents. Among these were various e-mails from Endo supervisors to cryotherapy technicians, including one mentioning plans to discuss "the development of [their] specific geographic territory" and another about the protocol for questions regarding "marketing materials." *Id.* vol. 4 at 875, 888. Hodges also submitted a company PowerPoint presentation with a slide instructing cryotherapy technicians to "help growth" by (1) "[a]sk[ing] [their] partners if they know of any other doc[tor] that might be interested in performing cryo[therapy]," (2) "[v]isit[ing] offices of former users and doctors who seldom do cases," (3) "[m]ak[ing] sure that [they] always have literature," and (4) "[b]e[ing] persistent

[because] they might say no a couple of times." *Id.* at 879. But LINA replied that the

PowerPoint presentation and e-mails "ha[d] already been reviewed" and would "not

be considered new evidence." *Id.* vol. 3 at 836. As such, LINA denied Hodges a

second appeal.

In April 2014, Hodges filed suit in the United States District Court for the

District of Colorado. In February 2017, the district court, having concluded that the

Policy failed to reserve to LINA discretion to decide employee-classification

questions, reviewed LINA's decision de novo and ruled that LINA had breached its

fiduciary duty to Hodges by "accept[ing] Endo's bare assertion that Hodges was not

'Sales personnel' without requiring documentation or a justification for that

assertion." *Id.* vol. 1 at 181–82. The court remanded the case for LINA to conduct

"further factfinding" on Hodges's employment classification. *Id.* at 183.

On remand, Hodges submitted three additional documents, which governed

Endo's "Incentive Compensation Plan" for cryotherapy technicians. *Id.* vol. 6 at

1423–34. Meanwhile, LINA requested that Endo submit further information showing

that Hodges was not a salesperson. Douglas Macpherson, Endo's Senior Vice

President and Associate General Counsel, responded:

> [Hodges] was a C[ry]oTherapy Technician whose job it was to operate
> C[ry]o equipment. His [job description] does not classify hi[m] as a sales
> employee, nor are any sales responsibilities included in the job
> description. The record reflects that Hodges did not participate in a sales
> incentive plan. The plan he did participate in . . . was based on the number
> of procedures he performed. The record also reflects that no part of his
> pay was tied to sales. It is true that he was asked to provide one lead a
> month for sales reps to call on. All that was required was to provide a
> lead, there was no requirement that the lead result in sales.

7

*Id.* at 1397. On May 23, 2017, LINA issued its remand determination, relying primarily on Macpherson's statement to conclude (once again) that Hodges was a Class 1 employee.

Hodges asked the district court to reopen the case. The court agreed and, in June 2018, it ruled that LINA had once again failed to adequately investigate Hodges's employment classification. Concluding that a second remand would be futile, the district court determined that Hodges was a salesperson under the ordinary meaning of that term, reversed LINA's contrary decision, and awarded Hodges Class 2 benefits "retroactive to the date his long term disability benefits commenced." *Id.* vol. 1 at 282. LINA now appeals that ruling.

## ANALYSIS

LINA raises two issues. First, LINA argues that the Policy gives it discretion to decide whether Hodges is a salesperson. If so, we would apply the arbitrary-and-capricious standard of review to its decision denying Hodges Class 2 benefits, not the de novo standard. But second, LINA contends that it doesn't matter what standard of review we apply: Hodges is not a Class 2 salesperson under the Policy. We consider each issue in turn.

## I. Standard of Review

In an ERISA case like this one, the appellate standard of review contains two layers: first, the standard of review applicable to the plan administrator's denial of benefits; and second, the standard of review applicable to the district court's ruling—

including its determination of what standard of review to apply to the administrator's denial of benefits. When, as here, "the district court's determination of the standard of review [applicable to the denial of benefits] did not require it to resolve any disputed historical facts, we do not defer to its determination but decide de novo what [that] standard of review should be." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1146 (10th Cir. 2009).

We review de novo a plan administrator's denial of benefits "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). But if the plan gives the administrator discretionary authority, "we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)). Under this standard, "our 'review is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'" *Id.* (quoting *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 825–26 (10th Cir. 2008)). "De novo review is the default position," and "the burden to establish that this court should review [the administrator's] benefits decision under an arbitrary-and-capricious standard falls upon the plan administrator." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (internal quotation marks and citation omitted). Consistent with this burden, when a plan is ambiguous

9

about whether it grants discretion, we apply the doctrine of *contra proferentem* to construe that ambiguity in the insured's favor. *See Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1253 (10th Cir. 2007).[4]

To enjoy deferential judicial review of its benefits decision, the administrator of an ERISA plan must reserve its discretion "in explicit terms" in the plan document. *Id.* at 1250. At the same time, our court has been "comparatively liberal in construing language to trigger the more deferential standard of review under ERISA." *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1268 (10th Cir. 2002) (citing *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1259 (10th Cir. 1998), and *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996)). For example, we have held that a policy provision requiring claimants to submit

---

[4] *See also Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 813 F.3d 420, 428 (1st Cir. 2016) ("[A] grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that *unambiguously* indicate that the claims administrator has discretion . . . .") (emphasis in original); *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008) ("[I]n the context of determining whether a plan sufficiently confers discretion, . . . any ambiguity in an ERISA plan is construed against the drafter of the plan . . . .") (internal quotations and alterations omitted); *Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("[W]hen the insurer instead issues a policy containing ambiguous claims submission language commonly used in non-ERISA contexts, the presumption should be there was no intent to confer such discretion."); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) ("[A]n administrator ha[s] discretion only where discretion was 'unambiguously retained' by the administrator. This is consistent with the established principles that ambiguities are construed *contra proferentem,* and that ambiguities are construed in favor of the insured.") (internal quotations omitted); *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1258 (3d Cir. 1993) ("[A] court's choice of the standard of review is itself a question of contract construction. . . . Application of *contra proferentem* in this case requires us to find the Plan did not grant [the administrator] discretion to determine which procedures are experimental because the Plan and the evidence are ambiguous.").

10

proof "satisfactory to [the plan administrator]" suffices to give the administrator discretion to determine facts relating to a disability. *Id.* at 1267–68.[5]

As proof that the Policy grants it discretion to decide whether Hodges was a salesperson, LINA quotes three Policy provisions. Primarily, LINA relies on language in the Policy's "Claims Procedures" section, which states that "[t]he Plan Administrator has appointed the Insurance Company as the named fiduciary for deciding claims for benefits under the Plan" and that "[t]he Insurance Company has 45 days from the date it receives a claim for disability benefits . . . to determine whether or not benefits are payable in accordance with the terms of the Policy." Appellant's App. vol. 2 at 312. LINA also cites two other portions of the Policy using similar language: (1) the "Termination of Disability Benefits" section, which states,

---

[5] Our "comparatively liberal" approach puts us on the minority side of a circuit split. Most circuits have expressly rejected *Nance*'s interpretation of "proof satisfactory to the administrator." *See Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 166 (4th Cir. 2013) ("[T]he phrase 'proof satisfactory to us' is inherently ambiguous."); *Gross v. Sun Life Assurance Co. of Canada*, 734 F.3d 1, 14 (1st Cir. 2013) ("[T]he 'satisfactory to us' construct fails to alert plan participants to the administrator's discretion because it is ambiguous as to *what* must be satisfactory to [the administrator]."); *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 417 (3d Cir. 2011) (same); *Feibusch v. Integrated Device Tech., Inc. Emp. Benefit Plan*, 463 F.3d 880, 884 (9th Cir. 2006) (same); *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639 (7th Cir. 2005) (same); *Fitts v. Fed. Nat'l Mortg. Ass'n*, 236 F.3d 1, 5 (D.C. Cir. 2001) (same); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (same). *But see Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1233 (11th Cir. 2006) (holding that requiring proof "satisfactory to [the administrator]" is sufficient to convey discretion); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002) (same); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 (6th Cir. 1998) (holding that the term "satisfactory," even without specifying to whom the proof must be satisfactory, is sufficient to grant discretion if the administrator is "the only named party with the right to request such evidence").

in part, that an employee's benefits will terminate when "[LINA] determines he or she is not [d]isabled," *id.* at 304; and (2) the "Reporting Requirements" provision, which provides that "[t]he Employer must, upon request, give [LINA] any information required to determine who is insured, the amount of insurance in force[,] and any other information needed to administer the plan of insurance," *id.* at 306.

LINA zeroes in on the word "determine" in each provision. *See* Appellant's Opening Br. at 27–29. LINA maintains that this wording "is consistent with the sort of plan language that this Court has found to trigger the deferential standard of review." *Id.* at 29; *see generally id.* at 28–31 (citing *Eugene S.*, *Nance*, *McGraw*, and *Chambers*). But Hodges counters that in those cases applying the deferential standard, "the [plan] language emphasize[d] the specific definition or decision as to which the insurer or plan [administrator] reserve[d] discretion." Appellee's Response Br. at 36. We agree with Hodges.

Under our ERISA jurisprudence, "it is essential to focus precisely on what decision is at issue, because a plan may grant the administrator discretion to make some decisions but not others." *Nance*, 294 F.3d at 1266 ("Depending on the specific language of the Plan, the standard for our review of [the administrator's] interpretation of the Plan and the standard for our review of [the administrator's] fact finding may or may not be the same."). And "[i]t is only when a plan specifically confers discretion to decide the question on which the benefit denial is based that the arbitrary and capricious standard applies." *Hubbert v. Prudential Ins. Co. of Am.*, 105 F.3d 669, 1997 WL 8854 at *4 (10th Cir. 1997) (unpublished); *see also McGee v.*

*Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1200 (10th Cir. 1992) ("[W]e review the terms of the health agreement and [the administrator's] denial of benefits de novo, but we apply the abuse of discretion standard to the plan physician's exercise of medical judgment in determining [the claimant's] eligibility for benefits.").[6]

Consistent with this principle, each of the cases LINA relies on identified a *specific issue* that the administrator retained discretion to determine. In *Chambers*, plan language "exclud[ing] from coverage 'medical or surgical procedures which in the judgment of [the administrator] are experimental'" granted the administrator "discretion to determine whether to deny a claimant insurance benefits for an 'experimental' procedure." 100 F.3d at 825 (alterations omitted). In *McGraw*, a plan

---

[6] Other circuits apply the same principle. *See, e.g.*, *Knopick v. Metro. Life Ins. Co.*, 457 F. App'x 25, 28 (2d Cir. 2012) ("Where the plan provides discretionary authority to the fiduciary or administrator to make certain determinations but does not provide blanket discretion to construe other plan terms, we review those determinations committed to the discretion of the fiduciary or administrator to ensure that they are not arbitrary or capricious; otherwise, we review the fiduciary or administrator's determinations *de novo*.") (citing *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) ("[T]he dissent goes too far, by suggesting that if anything is committed to the administrator's discretion, then everything is."); *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996) ("While other plan provisions may give [the administrator] discretion to decide peripheral issues, such as whether [a] claim was properly documented or timely filed, none of the plan's discretionary grants of authority covers [the administrator's] decision to deny [the claimant] benefits under the preexisting condition exclusion."); *Anderson v. Great W. Life Assurance Co.*, 942 F.2d 392, 395 (6th Cir. 1991) ("[D]iscretion is *not* an all-or-nothing proposition. A plan can give an administrator discretion with respect to some decisions, but not others."); *Frank v. Colt Indus., Inc.*, 910 F.2d 90, 99 (3d Cir. 1990) (noting that "an ERISA plan may reserve discretionary authority to management with regard to certain decisions" as opposed to "reserv[ing] *complete* discretion over employee eligibility for benefits").

provision stating that "[t]o be considered 'needed[,'] a service or supply must be *determined by* [*the administrator*] to meet" various tests "expressly g[ave the administrator] discretion to decide what [wa]s medically necessary." 137 F.3d at 1259 (bolding omitted). Likewise, in *Eugene S.*, the administrator retained discretion to decide what care was "medically necessary" because the plan (1) "limit[ed] 'Medically Necessary and Appropriate' services or supplies to those 'determined by [the administrator]' to be such" and (2) "limit[ed] payment for benefits to services that, 'in [the administrator's] judgment, are provided at the proper level of care.'" 663 F.3d at 1132. Finally, in *Nance*, the administrator had discretion to "find[] the facts relating to disability" because the plan required the claimant to submit proof "satisfactory to" the administrator. 294 F.3d at 1267–68.

Here, by contrast, the Policy does not require "proof satisfactory to" LINA. *See Nance*, 294 F.3d at 1268; *Ray v. Unum Life Ins. Co. of Am.*, 314 F.3d 482, 486 (10th Cir. 2002). Nor has LINA directed us to any language that grants it discretion over any specific determination. Rather, LINA argues that the authority "to determine whether or not benefits are payable in accordance with the terms of the Policy" conveys "broad authority to decide *all matters* relevant to a claim for LTD benefits . . . ." Appellant's Reply Br. at 5 (emphasis added). But we have never allowed such vague language to encompass *all decisions* that go into the claims process.

We acknowledge that we have often interpreted plan language as granting discretion to the administrator over all decisions that arise in the claims process,

14

including fact determinations and the interpretation of terms. But such cases involve clear and unambiguous discretion-conveying language—for instance, language reserving to the administrator the discretion "to construe the terms of the Plan, to resolve any ambiguities, and to determine any questions which may arise with the Plan's application or administration, including but not limited to determination of eligibility for benefits," *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1214 (10th Cir. 2015), or language "grant[ing] the Plan Administrator 'complete authority,' . . . to 'determine eligibility for benefits,' 'make factual findings,' 'construe the terms of the Plan,' and 'control and manage the operation of the Plan,'" *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012).[7] But here, the Policy contains no such language.

In other cases, we have construed narrower plan language to convey discretion to the administrator to interpret all policy terms (though not necessarily to resolve factual questions). *See, e.g.*, *Pratt v. Petroleum Prod. Mgmt., Inc. Emp. Sav. Plan &*

---

[7] Indeed, many of our cases have construed plan language to grant all-encompassing discretion when it does so explicitly. *See, e.g.*, *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 826 (10th Cir. 2008) (giving the administrator authority to "make, in its sole discretion, all determinations arising in the administration, construction, or interpretation of these Plans, including the right to construe disputed or doubtful Plan terms and provisions"); *Arfsten v. Frontier Airlines, Inc. Ret. Plan for Pilots*, 967 F.2d 438, 440 (10th Cir. 1992) (giving the administrator the authority "to construe the Plan and to determine all questions of fact that may arise thereunder"); *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1457 (10th Cir. 1991) (giving the administrator "sole discretion" and "full and complete authority, responsibility, and control over the management, administration and operation of the Plan, including, but not limited to, the authority to make appropriate determinations of the distributions due Members under the Plan and authorize and direct payment of benefits") (alterations omitted).

*Tr.*, 920 F.2d 651, 658 (10th Cir. 1990) (holding that a plan that granted the administrator the authority to "construe and interpret the Plan" conveyed discretion to decide "questions of plan interpretation"). But the policy language in such cases gives the administrator authority to "interpret" or "construe" the policy,[8] something that the Policy here does not do.

In short, nothing in the Policy grants LINA the discretion to conclude who qualifies as a salesperson. Rather, by stating that LINA "determines" eligibility, the Policy merely clarifies that LINA, and no one else, decides in the first instance whether to award benefits. As the Seventh Circuit put it, "All plans require an administrator first to determine whether a participant is entitled to benefits before paying them; the alternative would be to hand money out every time someone knocked on the door . . . ." *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 637 (7th Cir. 2005); *see also Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000) ("[T]his truism in the plan document implies nothing one way or the other about the scope of judicial review of [the administrator's] determination, any more than our statement that a district court 'determined' this or that telegraphs the scope of our judicial review of that determination."). The *Nance* court made the same point,

---

[8] *See, e.g.*, *Dycus v. Pension Ben. Guar. Corp.*, 133 F.3d 1367, 1369 (10th Cir. 1998) (applying the arbitrary-and-capricious standard of review to an administrator's interpretation of a policy term where the plan granted it authority to "decide all questions concerning the application or interpretation of the provisions of the plan") (alteration omitted); *Winchester v. Prudential Life Ins. Co. of Am.*, 975 F.2d 1479, 1483 (10th Cir. 1992) (deferring to the administrator's policy interpretation where the plan stated that the administrator "has the exclusive right to interpret the provisions of the Plan").

albeit in dicta, suggesting that discretion doesn't arise "from language that merely 'requires a determination of eligibility or entitlement by the administrator . . . .'" *See* 294 F.3d at 1268 (quoting *Herzberger*, 205 F.3d at 332); *see also Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) ("No plan provides benefits when the administrator thinks that benefits should not be paid!").

The plan language that LINA quotes simply directs *who* makes the initial benefits decision—in this case, the plan administrator, rather than the employer or employee—but we cannot stretch that language into a conveyance of any discretionary authority. If LINA wanted to reserve discretion to decide other aspects of a claim (such as whether an employee qualifies as a salesperson), then it should have done so explicitly. Thirty years have passed since the Supreme Court first held that de novo judicial review applies unless the benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See Firestone*, 489 U.S. at 115. Obviously, plan drafters have had ample time to include language giving discretion. And for nearly twenty years, *Nance* (and its progeny) have warned drafters of the consequences of vagueness:

> [P]lan drafters who wish to convey discretion to plan administrators are ill-advised to rely on language that is borderline in accomplishing that task. . . . [A]s more and more courts emphasize the need for clear language to convey discretion, courts that have found borderline language acceptable in the past may assume that plan drafters who have not clarified the language were not intent on conveying discretion.

*Nance*, 294 F.3d at 1268 n.3; *see also Gross v. Sun Life Assur. Co. of Canada*, 734 F.3d 1, 16 (1st Cir. 2013) ("[I]t is not difficult to craft clear language."); *Cosey v.*

*Prudential Ins. Co. of Am.*, 735 F.3d 161, 168 (4th Cir. 2013) ("[D]rafters of ERISA plans have had every opportunity to avoid adverse rulings on this issue, especially in light of the gradual but unmistakable change in the precedential landscape of federal appellate decisions."); *Feibusch v. Integrated Device Tech., Inc. Employee Ben. Plan*, 463 F.3d 880, 883-84 (9th Cir. 2006) ("[I]t is easy enough to confer discretion unambiguously . . . .") (citation omitted); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) ("[C]lear language can be readily drafted and included in policies . . . ."). Further, LINA is no stranger to ERISA litigation,[9] so its failure to clarify its policy language over the years leads us to "assume that . . . [it was] not intent on conveying discretion" in the Policy. *See Nance*, 294 F.3d at 1268 n.3. Indeed, under a separate heading of the Policy, titled "Additional Benefits," the contract provides, "The Insurance Company *has the sole discretion* to approve the Employee's participation in a Rehabilitation Plan and to approve a program as a Rehabilitation Plan." Appellant's App. at 303 (emphasis added). This language

---

[9] *See, e.g.*, *Null v. Cmty. Hosp. Ass'n*, 379 F. App'x 704, 706 (10th Cir. 2010) ("In contrast to LINA's lack of discretion when considering LTD benefits, the life-insurance component of the plan afforded LINA discretion to decide questions of eligibility for coverage or benefits under the plan and to make any related findings of fact."); *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) ("Where, as here, a plan administrator did not have discretionary authority to determine eligibility for benefits or to construe the terms of the plan, district courts will review a benefit denial *de novo*.") (internal quotation marks omitted); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 630 (10th Cir. 2003) ("AlliedSignal's Plan expressly vests discretionary authority to determine benefits eligibility in the Plan Administrator (AlliedSignal), who has delegated its discretion to LINA.").

further demonstrates that LINA knows how to draft discretion-conferring language. It simply chose not to here.

In sum, LINA has failed to meet its burden to show that it is entitled to deference in deciding who qualifies as a salesperson under the Policy. *See Eugene S.*, 663 F.3d at 1130. As such, we review the question de novo.[10] *See id.*

## II. Whether Hodges Qualifies as a Salesperson

"In deciding whether an ERISA employee welfare benefit plan provides for vested benefits, we apply general principles of contract construction." *Deboard v. Sunshine Min. & Ref. Co.*, 208 F.3d 1228, 1240 (10th Cir. 2000). "[T]he insured ultimately carries the burden of showing he is entitled to [ERISA] benefits . . . ." *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1324 (10th Cir. 2009). "Unless the parties intend otherwise, terms in an insurance policy should be assigned their plain and ordinary meaning." *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (citation omitted). In interpreting policy language, we use an objective standard, considering the "common and ordinary

---

[10] Even if the Policy had granted discretion, LINA concedes that, because it is both the claim administrator and the funder of the LTD benefits, it has a conflict of interest, so it would not enjoy the benefit of pure arbitrary-and-capricious review. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) (explaining that in reviewing a conflicted administrator's benefit determination under the arbitrary-and-capricious standard, the conflict should be weighed as a "factor"); *accord Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1361 (10th Cir. 2009). And though we generally agree with the district court that LINA "deferred entirely to Endo's assessment" of Hodges's employment classification, *see* Appellant's App. vol. 1 at 270, we need not decide whether this constituted a procedural irregularity warranting de novo review, because the Policy clearly fails to grant LINA any discretion. *See LaAsmar*, 605 F.3d at 797.

meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Miller*, 502 F.3d at 1250 (internal quotation marks omitted). Accordingly, the question before us is whether a reasonable person in Hodges's position would have believed himself to be a salesperson. *See id.*

According to Hodges, a "salesperson" is one "whose job involves selling or promoting commercial products." Appellee's Response Br. at 48 (citing Oxford English Dictionary). LINA has not disputed this definition, either in the district court or on appeal, and this definition comports with this court's understanding of the term, *see* Oxford English Dictionary (online ed. 2018) (defining "salesman" as "[a] man whose business it is to sell goods or conduct sales"); Merriam-Webster (online ed. 2019) (defining "salesman" as "one who sells in a given territory, in a store, or by telephone"). The Supreme Court recently endorsed this "ordinary meaning" definition of "salesman." *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018) ("The ordinary meaning of 'salesman' is someone who sells goods or services.").

After due consideration, we conclude that Hodges qualified as a Class 2 salesperson. We agree with the district court, which summarized the supporting evidence as follows:

> Hodges had responsibilities to sell and promote Endo's commercial products and services at every available juncture . . . [and] could only have more [cryotherapy] cases to treat if he had successfully sold new doctors on Endo's products and services or sold existing doctors on performing more cryotherapy procedures. Also, . . . the "Summary of

Purpose" in the description of his job stated that part of Hodges' duties was to "[a]ssist in the growth and development of existing and new business lines." . . . Hodges was also supposed to "market the technology" and was required "to submit a minimum of [one] lead a month for new cryo[therapy] users, new applications for existing cryo[therapy] users, or any other lead for any of Endo's business." . . . The record reflects that Hodges received a significant portion from bonuses when he did sell products and services, and these earnings were designate[d] as bonuses on pay stubs. . . . As his counsel noted, Hodges "received benefits for the leads that he provided for prospective cryotherapy customers—he was given a bonus of $3,000 for every $100,000 of pathology work that a doctor performed using Endo's equipment and services, and he received a monthly bonus for every case that he worked on. . . . [T]hese substantial sales responsibilities and sales-driven compensation would cause a reasonable insured to believe that he was Sales Personnel—and to devote his efforts to sales in order to increase his compensation . . . .

The three Incentive Compensation Plans also support a finding that Hodges had sales responsibilities . . . . These plans provided bonuses, also referred to as "incentive compensation payments," to employees like Hodges who recruit[ed] new physicians and convince[d] those physicians to treat cases using Endo's methods. . . . While LINA insists that those plans cannot be indicative of sales responsibilities because they "expressly apply to those 'performing cryotherapy procedures,' not sales personnel" . . . LINA never explains why the two are mutually exclusive.

Appellant's App. vol. 1 at 280–81.

Clearly, Hodges's job "involved selling" Endo's products. The record contains numerous e-mails and presentations from Endo supervisors emphasizing to cryotherapists the importance of "help[ing] growth" by "[a]sk[ing] [their] partners if they know of any other doc[tor] that might be interested in performing cryo[therapy]," "[m]ak[ing] sure that [they] always have literature," and "[b]e[ing] persistent [because] they might say no a couple of times." *Id.* vol. 4 at 879. Persistence is the hallmark of a good salesperson. And one e-mail references "the development of [cryotherapy technicians'] specific geographic territory," *id.* at 875,

21

another telltale sign that Hodges was a salesperson. *See* Merriam-Webster (online ed. 2019) (defining "salesman" as "one who sells *in a given territory*, in a store, or by telephone") (emphasis added). LINA's post hoc characterization of Hodges's sales bonuses as "commissions" is not credible, given that it withheld federal taxes on those payments at the rate for bonuses. Appellant's App. vol. 4 at 1048–49. Nor does its reasoning (borrowed from Endo's Senior Vice President) that "there was no requirement that the [one lead per month that Hodges was required to obtain] actually result[] in sales," *id.* vol. 6 at 1395, convince us otherwise. A salesperson may have a bad day or a bad week when he is unable to close any sales, but that doesn't change his job, which is to sell products. It is true that Hodges derived a majority of his income from non-sales activities, namely performing cryotherapy services. But without selling the company's products, Hodges could not continue cryotherapy, and the Policy does not define how much selling one must do to be considered "sales personnel." We therefore agree with the district court that a reasonable person in Hodges's position would have believed himself to be a salesperson. *See Miller*, 502 F.3d at 1250.

## CONCLUSION

Consistent with the foregoing, we affirm the ruling of the district court.